```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
JONAH SEEMAN,

                Plaintiff,           OPINION

        -against-
                                     09 Civ. 4901 (MGC)

LOCAL 32B-32J, SERVICE
EMPLOYEES UNION, GRACIE
GARDENS OWNERS CORP., AND
COOPER SQUARE REALTY, INC.

                Defendants.

----------------------------------X

APPEARANCES:

        MICHAEL G. O'NEILL LAW OFFICE
        Attorneys for Plaintiff
        30 Vesey Street, Third Floor
        New York, New York 10007

        BY: Michael G. O'Neill, Esq.
            Theresa Wade, Esq.

        OFFICE OF GENERAL COUNSEL
        Attorneys for Defendant Service Employees
        International Union, Local 32BJ
        101 Avenue of the Americas, 19th Floor
        New York, New York 10013

        BY: Lyle D. Rowen, Esq.
            Walter Meginness, Esq.

        CANTOR, EPSTEIN & MAZZOLA, LLP
        Attorneys for Defendant Gracie Gardens
        49 West 37th Street
        New York, New York 10018

        BY: Bryan J. Mazzola, Esq.
```

1

**Cedarbaum, J.**

Jonah Seeman alleges that Gracie Gardens Owners Corp., the residential cooperative that employed him for forty years, suspended him without good cause and refused to reinstate him even though he had satisfied the conditions of his suspension. These acts, Seeman claims, violated the collective bargaining agreement ("CBA") between Gracie Gardens and his union, Local 32BJ, Service Employees International Union ("the Union").[1] He also claims that the Union breached its duty of fair representation by committing various errors during the arbitration of his claim against Gracie Gardens. Seeman seeks to overturn the results of the arbitration. Gracie Gardens and the Union have moved for summary judgment. For the following reasons, the motions are granted.

## BACKGROUND

The following material facts are undisputed except where noted.

Seeman is a 63-year-old man who has been diagnosed with a developmental disorder. Despite his limitations, he

---

[1] Seeman originally brought this claim against both Gracie Gardens and Gracie Gardens' managing agent, Cooper Square Realty, Inc. The managing agent was dismissed with Seeman's consent on October 1, 2009.

worked for over forty years as a doorman in an apartment building owned by Gracie Gardens. His job required him to monitor people entering and leaving the building, assist residents, log visitors and packages into a log book, and respond to emergencies. Over the course of his entire tenure at the Gracie Gardens, Seeman never requested an accommodation for diminished mental capacity.

In December 2007, following various complaints about Seeman's body odor and bad breath, Seeman received a one-day suspension from work ("the 2007 suspension"). The Union, which acted as the bargaining agent for Gracie Gardens' building staff, filed a challenge to Seeman's suspension ("the 2007 grievance") through a grievance and arbitration procedure set out in the CBA. After Seeman initiated the 2007 grievance, the Union dispatched an investigator to look into the circumstances of the suspension. The Union tried to reach a settlement with the employer but was unsuccessful.

On February 8, 2008, Seeman was suspended again, this time because his locker had become infested with bedbugs ("the 2008 suspension"). Seeman's residence, which he shared with his elderly mother, turned out to be similarly bug-ridden. Gracie Gardens prohibited Seeman from returning to work until he could confirm that his residence

3

had been inspected, treated, and certified by a licensed examiner as free of bedbugs.

Three days later, Seeman filed a grievance through the Union for the 2008 suspension ("the 2008 grievance"). Assisted by the Union investigator who was already handling the 2007 grievance, Seeman attempted to satisfy the Gracie Gardens' demands by proving that he and his mother had moved to a new, bedbug-free apartment. To that end, he gave Gracie Gardens copies of the lease for the new apartment, a receipt showing the purchase of new furniture, and a receipt from an exterminator confirming that the new apartment was clean of bedbugs.

Nevertheless, Gracie Gardens refused to reinstate Seeman to his position. It demanded that Seeman produce an exterminator's inspection not only of his new apartment, but also of the apartment in which he had been living when the suspension began. Because Seeman had by this time vacated his previous apartment, he was unable to meet this demand. He therefore remained on suspension while the Union continued to negotiate for his reinstatement.

On February 27, 2008, while the Union's negotiation was ongoing, Seeman's mother drafted a letter of resignation for her son. It stated in relevant part:

> I am writing this letter to let you know that
> after 41 years of service, I have to retire so I
> can take care of my mother who is 81 years old
> and can not take care of herself.  Please sent
> [sic] all the pay that is coming to me including
> my pay for 5 weeks vacation.
>
> Thank you very much it was very nice working for
> you.

Seeman read the letter, signed it, and mailed it to Gracie Gardens.  He did not, however, inform the Union of this decision.

Why Seeman chose to sign and submit the resignation letter is disputed.  According to Seeman's brother, Meir, Seeman resigned in part because the Coop's superintendent had misled him into believing that, contrary to the Coop's actual policy, resigning was the only way to receive his accrued vacation pay.  In contrast, both Seeman and his mother testified in depositions that he resigned because his mother did not wish him to return to work, and not because of anything that the superintendent had told him. Nevertheless, and contrary to the sworn statements of Seeman and his mother, the brief submitted by counsel for Seeman now adopts Meir's explanation.

On March 6, 2008, Gracie Gardens accepted Seeman's resignation and issued him payroll checks for his accrued paid leave as well as reimbursement for the 2007

5

suspension.  Seeman cashed the checks upon receipt, again without notifying the Union.  He then signed and submitted an application for pension benefits.

A few days after accepting the resignation, Gracie Gardens and the Union agreed on a settlement of Seeman's 2008 grievance.  In exchange for a general release of the grievance, that settlement would have provided Seeman with, among other things, eleven weeks of severance pay and a continuation of health insurance coverage through July 2008.  Gracie Gardens prepared a stipulation of agreement and forwarded it to the Union for Seeman's signature.

Seeman, however, never signed the stipulation.  At some point in mid-April, Seeman told Meir that he wanted to rescind the resignation.  Seeman and Meir met with Union attorneys, including the Director of the Union's Contract Grievance Center, Jodi Goldman, and explained that Seeman wanted to return to work and was not interested in a monetary settlement.  Meir drafted a letter rescinding the resignation, which Seeman signed, and instructed the Union attorneys to proceed with the 2008 grievance.

On April 23, 2008, the Union requested a hearing with the Coop's bargaining agent, the Realty Advisory Board on Labor Relations, Inc. ("RAB"), to discuss both the 2007 and 2008 grievances.  Goldman assigned herself to handle the

6

2008 grievance in the event that it reached arbitration. The requested meeting occurred on May 12, 2008, and was attended by representatives of Gracie Gardens, the Union, and the RAB, as well as Seeman and Meir.  That meeting did not produce a resolution, leaving arbitration as the remaining step under the CBA's procedures.  The Union elected to submit the 2008 suspension to arbitration.  It did not, however, submit the 2007 grievance, in light of the fact that Gracie Gardens had already reimbursed Seeman for the 2007 suspension.

By this time, Seeman had retained a private attorney. On the eve of the arbitration hearings, Goldman sent that attorney a letter in which she detailed the Union's concerns over the merits of Seeman's grievance.  She identified Seeman's seemingly uncoerced resignation and pension application as likely obstacles to success. Nevertheless, she proceeded with Seeman's case.

The arbitration of the 2008 grievance occurred over the course of several hearings.  Seeman arrived at the last of these hearings accompanied by his private attorney, who requested permission to attend.  Because of a Union policy prohibiting members' private attorneys from being present at arbitration hearings, Goldman refused.

7

The Union's case was that Seeman should not be bound by his resignation because it was an exasperated response to Gracie Gardens' unreasonable conditions. The Union argued that Seeman resigned both because his mother had concerns about his returning to work and because he was deeply frustrated with Gracie Gardens' handling of the 2008 suspension. It did not argue that Seeman was influenced by anything the superintendent had told him regarding vacation pay. The Union presented this case through the testimony of Seeman and his mother. In addition, it attempted to demonstrate Seeman's change of residences through documents that Seeman had previously presented to Gracie Gardens: the new lease, the receipt for the purchase of new furniture, and the receipt from a pest controller indicating the complete absence of bedbugs. The Union elected not to call either Meir or the Union investigator to testify.

On February 23, 2009, the arbitrator dismissed the 2008 grievance, finding that Gracie Gardens was justified in suspending Seeman because of the health risks posed by bedbugs. He further found that Seeman's resignation was voluntary and final.

Three months after the arbitrator's decision, Seeman filed this action against the Union and Gracie Gardens.

**DISCUSSION**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists when the evidence is such that a reasonable finder of fact could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986).  In deciding whether a genuine dispute exists, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

Seeman's allegations that Gracie Gardens breached the CBA and that the Union violated its duty of fair representation are formally two distinct claims governed by two statutes.  The claim against Gracie Gardens arises under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a).  See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164, 103 S. Ct. 2281, 2290, 76 L. Ed. 2d 476 (1983).  The claim against the Union is implied under the scheme of the National Labor Relations Act, 29

9

U.S.C. § 151 et seq.  See DelCostello, 462 U.S. at 164 & n.14.  In spite of this formal distinction, the two claims are "inextricably interdependent" and together constitute what is known as "a hybrid § 301/fair representation claim."  Id. at 164-165.

    To prevail on such a hybrid claim, employees "must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union."  United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 62, 101 S. Ct. 1559, 1563-64, 67 L. Ed. 2d 732 (1981).  Success on the claim against the union is a prerequisite to judicial consideration of the merits of the claim against the employer.  Young v. U.S. Postal Serv., 907 F.2d 305, 307 (2d Cir. 1990); see also Russo v. 210 Riverside Tenants, Inc., No. 10 Civ. 914, 2011 WL 166928, at *3 (S.D.N.Y. Jan. 19, 2011) ("[T]he plaintiff must prove fault by both in order to succeed against either.").  As a result, courts presented with hybrid claims need not reach the question of whether the employer violated the CBA unless the plaintiff can first establish that the union failed to provide fair representation.  Acosta v. Potter, 410 F. Supp. 2d 298, 309 (S.D.N.Y. 2006).

    Accordingly, I begin with the claim against the Union.  "When a labor organization has been selected as the

10

exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status under § 9(a) of the NLRA as the exclusive representative of the employees in the unit, to represent all members fairly." Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 44, 119 S. Ct. 292, 299, 142 L. Ed. 2d 242 (1998). This duty includes "the fair and prompt consideration and, if dictated by controlling legal standards, processing on behalf of employees of their claims under contract dispute resolution procedures." Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1153 (2d Cir. 1994).

A plaintiff asserting a fair representation claim has the burden of proving two elements. First, he must show that "the union's actions or inactions are either arbitrary, discriminatory, or in bad faith." Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010) (internal quotation marks omitted). Once that showing is made, he must demonstrate a causal connection between the union's wrongful conduct and his injuries. Id.

Seeman avers that the Union's conduct was both arbitrary and in bad faith. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness

11

as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 111 S. Ct. 1127, 1130, 113 L. Ed. 2d 51 (1991) (internal citation and quotation marks omitted).  "This wide range of reasonableness gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." Marquez, 525 U.S. at 45-46 (internal quotation marks omitted). Thus, the standard for arbitrariness does not encompass tactical errors or negligence.  Vaughn, 604 F.3d at 709. Bad faith, the other form of breach that Seeman alleges, includes fraud, dishonesty, and other intentionally misleading conduct, and "requires proof that the union acted with an improper intent, purpose, or motive." Id. at 709-10 (internal quotation marks omitted).

   Viewing the undisputed facts in the light most favorable to Seeman, the Union's allegedly improper conduct involved nothing more than judgment calls falling well within the Union's "broad discretion" to decide "whether and how to pursue an employee's grievance against an employer."  Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 567-68, 110 S. Ct. 1339, 1346, 108 L. Ed. 2d 519 (1990).

   First, Seeman points to what he considers an unreasonable delay in prosecuting the 2008 grievance.  The

12

Union accepted Seeman's administrative complaint on February 11, 2008, but did not request a grievance conference with the Coop until April 23, 2008, longer than the forty-five-day limit specified in the CBA. According to Seeman, a jury could find that the Union was engaging in dilatory tactics in order to avoid processing a grievance that it never intended to process, relenting only because of pressure from Meir.

The undisputed facts, however, preclude such a finding. After Seeman initiated the 2008 grievance, the Union devoted time to investigating the circumstances of the suspension. The Union investigator's case log reveals a good faith effort to determine the merits of Seeman's grievance, involving numerous communications with Goldman, the Coop, and members of Seeman's family. This process was drawn out further by Seeman's resignation and the Union's efforts to secure a favorable settlement. No reasonable jury could conclude that the Union was simply sitting on its hands. As for the CBA's forty-five-day deadline, there is no evidence that the lapse of a longer period of time prejudiced Seeman's case. The arbitrator rendered a decision on the merits without reference to the CBA's deadline.

Second, Seeman criticizes Goldman's decision not to call either Meir or the Union investigator as witnesses during the arbitration hearings.  Seeman contends that Meir could have testified to the effects of Seeman's disability, the interpersonal dynamic between Seeman and his mother, Seeman's efforts to comply with the Union's conditions for reinstatement, and the impetus behind Seeman's resignation. Yet Meir did not live with Seeman and was not involved in any of Seeman's efforts to meet the Coop's demands.  Nor was Meir even aware that Seeman had submitted the resignation letter until after the fact.  Meir therefore had no personal knowledge concerning any of the facts about which he would have ostensibly testified.

Seeman argues that the investigator could have testified that, consistent with Meir's theory, Seeman resigned because the Coop's superintendent told him that it was the only way to receive his vacation pay.  That testimony would have been based on statements that Seeman made to the investigator during an interview.  Yet even if those statements could have been admitted under the arbitral forum's rules on hearsay evidence, Goldman reasonably declined to rely on them.  In their depositions, both Seeman and his mother denied that this was the motive for the resignation.  The Coop's superintendent likewise

denied ever making the statement attributed to him.  The Union's attempt to present a consistent narrative from witnesses with firsthand knowledge, rather than a narrative undermined by conflicting testimony from declarants with no personal knowledge, was not arbitrary or in bad faith.

Third, Seeman alleges that Goldman harbored animosity toward Meir.  That fact, according to Seeman, would create a triable issue of the Union's good faith.  Yet while a union representative's personal hostility toward a grievant may constitute bad faith in some circumstances, see, e.g., Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 585 (6th Cir. 1991), Seeman has not cited any case in which a court extended that principle to cover animus against a grievant's relative or some other third party.  In any event, even if such a claim is cognizable, Goldman's feelings about Meir would not support a finding of bad faith unless they had led her to engage in intentional misconduct in her representation of Seeman.  Vaughn, 604 F.3d at 709-10.  Seeman contends that such misconduct can be found in Goldman's rejection of Meir's explanation for Seeman's resignation.  As discussed above, however, that was a legitimate, strategic choice as to which narrative was supported by the evidence and likely to persuade the arbitrator.  Moreover, there is no evidence that Goldman

15

made that decision with an improper intent, purpose, or motive.

Fourth, Seeman argues that the Union's refusal to introduce his alleged disability as a material fact during the arbitration was either arbitrary or in bad faith. But Goldman was well within her tactical discretion in deciding not to rely on Seeman's mental capacity, which had not required any accommodation during his forty years of employment at Gracie Gardens. The Union sought to prove that Seeman should not have been bound by his resignation. On the evidence available, it was not arbitrary to conclude that frustration and duress would be more compelling motives for Seeman's resignation than cognitive ability. Nor was it arbitrary to argue that, prior to the resignation, Seeman was entitled to reinstatement simply because he had complied with the Coop's original conditions for reinstatement. Seeman's alleged disability was not obviously relevant to the Union's reasonably constructed case on his behalf. As for bad faith, Seeman has identified no admissible evidence showing that the Union deliberately suppressed proof of a disability for some illicit purpose.

Finally, Seeman asserts that Goldman's preparation was inadequate and her advocacy perfunctory. Because Goldman

16

did not introduce evidence that Seeman believes was consistent with Meir's narrative, Seeman infers that Goldman must have either failed to review the Union investigator's case file or else ignored it in bad faith. But the fact that a lawyer does not introduce a given piece of evidence does not in itself support an inference that the lawyer had neglected to examine that evidence. There is no proof that Goldman overlooked the investigator's file or that the withholding of particular facts from the arbitration hearings was anything other than a tactical decision.

Furthermore, Seeman has not disputed Goldman's deposition testimony concerning the steps that she took to plan the case. In April 2008, she reviewed the case with Seeman and Meir, focusing specifically on how to portray the resignation in the light most favorable to Seeman. In June 2008 and again in January 2009, she met with Seeman and his mother in order to prepare them for direct examination. She drafted an opening statement, direct examinations of her witnesses, and notes for anticipated cross examination of the Gracie Gardens' witnesses. And she wrote to Seeman's private attorney before the first arbitration hearing to convey her concerns about the merits

of the grievance.  This preparation was sufficient under the Union's duty of fair representation.

Based on the undisputed material facts, Seeman's claim against the Union for violating its duty of fair representation fails.  As a result, the hybrid § 301/fair representation claim fails against both defendants as a matter of law.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment are granted.

SO ORDERED.

Dated:    New York, New York
          March 3, 2011

                                S/_____
                                    MIRIAM GOLDMAN CEDARBAUM
                                   United States District Judge